UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

# No. 22-1604



SUSHOVAN HUSSAIN,
and all others similarly situated,

*Appellant/Petitioner,*

v.

RACHEL THOMPSON, Warden of Federal Correctional Institution
Allenwood Low; MICHAEL CARVAJAL, Director of the Federal
Bureau of Prisons; MERRICK GARLAND, Attorney General of the
United States of America, in their official capacities,

*Appellees/Respondents.*

---

Appeal from the United States District Court
for the Middle District of Pennsylvania
(Case No. 3-21-cv-01635-MEM)
District Judge: Honorable Malachy E. Mannion

---

## REPLY BRIEF FOR APPELLANT/PETITIONER

---

SUSHOVAN HUSSAIN
REG. NO. 24067-111
ALLENWOOD LSCI
P.O. BOX 1000
WHITE DEER, PA 17887

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF CASE................................................................... 6

II.   THE SUBSTANTIAL QUESTION OF LAW IS WHETHER THE
      BOP IS PERMITTED BY THE U.S. CONSTITUTION OR ANY
      LAW OR STATUTE, TO DEVIATE FROM THE LEGISLATIVE
      TEXT OF TWO STATUTES AT ISSUE (THE CARES ACT AND
      THE FSA) ....................................................................................... 8

      A.    APPLICABLE LAW ............................................................. 8

      B.    DISCUSSION....................................................................... 9

            1.    THE CARES ACT AUTHORIZED THE ATTORNEY
                  GENERAL TO ENACT THE LEGISLATION ......................... 9

            2.    THE FIRST STEP ACT AUTHORIZES ONLY INMATES
                  SUBJECT TO "A FINAL ORDER OF REMOVAL" TO BE
                  DENIED EARNED TIME CREDITS ("ETCS") .................... 11

III.  OTHER FACTORS FOR THIS COURT TO CONSIDER........................... 13

      A.    RESPONDENTS' POLICIES USED TO DENY HOME
            CONFINEMENT UNDER THE CARES ACT ARE AN
            ABUSE OF STATUTORY AUTHORITIES...................................... 13

      B.    RESPONDENTS INCORRECTLY DISMISS THE
            SERIOUSNESS OF COVID-19 AT FCI ALLENWOOD LOW ...... 18

      C.    RESPONDENTS INCORRECTLY STATE THAT HUSSAIN
            RECEIVED TIME CREDIT FOR FSA EDUCATION
            CLASSES ......................................................................... 20

IV.   THE DISTRICT COURT ERRED IN SUMMARILY DISMISSING
      HUSSAIN'S PETITION UNDER RULE 4 STANDARDS ......................... 21

V.    RESPONDENTS' RESPONSE DEMONSTRATES THAT
      ADMINISTRATIVE REMEDIES WOULD HAVE BEEN FUTILE......... 23

| | | |
|---|---|---|
| VI. | CONCLUSION | 25 |
| VII. | RELIEF REQUESTED | 27 |
| CERTIFICATE OF COMPLIANCE | | 29 |
| CERTIFICATE OF SERVICE | | 30 |

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Federal Cases**

*62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*,
340 U.S. 593 (1951) ............................................................................................. 8

*Barden v. Keohane*,
921 F.2d 476 (3d Cir. 1991) ............................................................................... 22

*Collins v. Canaan*,
No. 21-2878, 2022 WL 2752536 (3d Cir. July 14, 2022) ................................... 18

*Dylan Jones v. Warden Engleman*,
No. 2:22-cv-05292, 2022 (C.D. Cal., Oct. 7, 2022) ............................................ 12

*K Mart Corp. v. Cartier, Inc.*,
486 U.S. 281 (1988) ............................................................................................. 8

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. ---, 140 S. Ct. 2367 (2020) .................................................................... 8

*Lyons v. Marshalls*,
840 F.2d 202 (3d Cir. 1988) ............................................................................... 24

*Moody v. Gubiotti*,
No. 21-12004, 2022 (D.N.J. Oct 3, 2022) ........................................................... 12

*Rodriguez v. Copenhaver*,
823 F.3d 1238 (9th Cir. 2016) ............................................................................ 22

*Sierra v. Jacquez et al.*,
No. 22-cv-01509 (W.D. Wash. Jan. 11, 2023) .................................................... 12

*United States v. Mieses*,
No. 17 CR 251 (PGG), 2021 WL 124420 (SDNY, Jan. 13, 2021) ..................... 19

*Vasquez v. Strada*,
684 F.3d 431 (3d Cir. 2012) ............................................................................... 22

*Wilson et al. v. Williams et al.*,
   No. 4:20-cv-00794-JG (N. Ohio) ........................................................................ 17

## Federal Statutes

18 U.S.C.S. 3621 ....................................................................................................... 21

18 U.S.C.S. 3624 ......................................................................................................... 9

18 U.S.C.S. 3632 ....................................................................................................... 11

I.    STATEMENT OF CASE

The Constitutional rights violations at issue here—which include discrimination—are too blatant and consequential to ignore. While this appeal is presented by *pro se* Appellant-Petitioner Sushovan Hussain ("Hussain"), this Court's review and determination of these issues will have far-reaching implications in determining how the Federal Bureau of Prisons ("BOP") treats both U.S. citizens and non-citizens within their custody.

The substantial question of law presented here is whether the U.S. Constitution, or any other legislation or law, allows the BOP to deviate from the simple and plain legislative text of the CARES Act and the First Step Act, and in so doing, to abridge, abrogate and violate the Constitutional rights of most foreign nationals within their custody. The answer is "no."

Respondents' brief (Dkt. 25) obfuscates and evades the true intent of Hussain's appeal by failing to address the substantial questions of law and the Constitutional rights violation presented therein. Those questions are:

(a)    Is it discriminatory and in violation of the Constitution for Respondents to deny safe harbor from the COVID-19 pandemic to Hussain, a medically vulnerable inmate, on the basis of his national origin, while offering safe harbor to similarly situated U.S. citizen inmates?

(b)    Is it discriminatory and in violation of the Constitution for Respondents to impose impermissible and punitive standards in the execution of Hussain's sentence, on the basis of his national origin, thereby incarcerating Hussain longer than similarly situated U.S. citizens?

Respondents' arguments can be summarized into three points:

i)    That a "detainer class" is created including inmates with immigration detainers and conduct detainers and because, in Respondents' view, it is not a "suspect class," there is no resulting discrimination;

ii)    That, because all inmates with an immigration detainer somehow present a "risk of flight," there is a "rational basis" for denial of home confinement to such detainees; and

iii)    That the BOP has the sole authority to make determinations about an inmate's place of incarceration, so courts do not have jurisdiction over the BOP's decision to deny home confinement.

Hussain replies to these arguments in this brief. But the core issue should not be lost in the fog of detail. It is that the BOP deviates from the simple and plain legislative text of the CARES Act and First Step Act statutes by using the immigration detainer to deny home confinement and Earned Time Credits. By doing so, the BOP and Respondents discriminate and violate Hussain's Constitutional rights.

7

Respondents accept and agree that the BOP made its decisions—those at issue in this appeal—on the basis of the immigration detainer that was issued to Hussain. Respondents do not point to any statutory text or language (in either the CARES Act or the First Step Act) that allows the BOP to use an immigration detainer, issued solely because of an inmate's national origins, as the basis for the BOP's decisions.

Hussain respectfully requests that this Court reverse the dismissal order of the District Court and remand the case back to the District Court with instruction to grant relief.

II.     THE SUBSTANTIAL QUESTION OF LAW IS WHETHER THE BOP IS PERMITTED BY THE U.S. CONSTITUTION OR ANY LAW OR STATUTE, TO DEVIATE FROM THE LEGISLATIVE TEXT OF TWO STATUTES AT ISSUE (THE CARES ACT AND THE FSA)

A.     APPLICABLE LAW

Courts have consistently concluded that no deviation from the legislative text be allowed. For example, *see 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 600 (1951) ("[W]e must take care not to extend the scope of the statute beyond the point where Congress indicated it would stop."); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. ---, 140 S. Ct. 2367, 2380 (2020) ("Our analysis begins and ends with the text." (citation omitted)); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of [a] statute, the court must

8

look to the particular statutory language at issue, as well as the language and

design of the statute as a whole.").

B.  DISCUSSION

1.  THE CARES ACT AUTHORIZED THE ATTORNEY
GENERAL TO ENACT THE LEGISLATION

a)  The pertinent section of the CARES Act, Section

12003(b)(2), which authorized the Attorney General ("AG"), states as follows:

"[d]uring the covered emergency period, if the Attorney General finds
that emergency conditions will materially affect the functioning of the
Bureau, the Director of the Bureau may lengthen the maximum
amount of time for which the Director is authorized to place a prisoner
in home confinement under the first sentence of section 3624(c)(2) of
title 18, U.S. Code, as the Director determines appropriate."

b)  The plain text of the first sentence of 18 U.S.C.S.

3624(c)(2), states as follows:

"Home confinement authority. The authority under this subsection
may be used to place a prisoner in home confinement for the shorter
of 10 per cent of the term of imprisonment of that prisoner or 6
months."

c)  The pertinent section of the Attorney General's

memorandum of April 3, 2020, states as follows:

"… *[T]he CARES Act now authorizes me* to expand the cohort of
inmates who can be considered for home release upon my finding that
emergency conditions are materially affecting the functioning of the
Bureau of Prisons. I hereby make that finding and *direct that*, as
detailed below, you give priority in implementing these new standards
to the most vulnerable inmates at the most affected facilities,
consistent with the guidance below."

9

*See* Ex. 1 at 1 (emphases added).

The Attorney General directed the BOP that its "review should include all at-risk inmates—not only those who were previously eligible for transfer," and further directed that "protecting the public" was the only exemption to the "all at-risk inmate" directive, instructing the BOP that "each inmate is unique" and that the BOP make "careful, individualized determinations" in this context, all under the authority of the CARES Act.

This is the unambiguously clear and plain text of the CARES Act legislation as established by Congress and enacted by the Attorney General through his April 3, 2020 memorandum. In this once-in-a-century pandemic emergency, the Attorney General gave the two aforementioned specific directions—*i.e.*, to include "all at-risk inmates" and to make "careful, individualized determinations"—under the authority of the CARES Act to the Director of the BOP. Respondents do not dispute those facts—or the fact that the BOP ignored those instructions when it used the immigration detainer, without conducting any individualized determination, to deny Hussain home confinement. *Id.* at 2-3. By deploying policies that deviate from Congress's intent and the simple and plain text of the statute and the April 3, 2020 Attorney General memorandum, the BOP has discriminated against Hussain.

10

2.   THE FIRST STEP ACT AUTHORIZES ONLY INMATES
SUBJECT TO "A FINAL ORDER OF REMOVAL" TO BE
DENIED EARNED TIME CREDITS ("ETCs")

The exclusion section of the FSA at 18 U.S.C.S. 3632(d)(4)(E)(i) states as

follows:

"Deportable prisoners ineligible to apply time credits.

IN GENERAL. - A prisoner is ineligible to apply time credits under
subparagraph (C) if the prisoner is subject of a final order of removal
under any provision of the immigration laws (as such term is defined
in section 101(a)(17) of the Immigration and Nationality Act
(8 U.S.C. 1101(a)(17))."

Respondents do not dispute that the BOP published its interpretation of the

FSA in the Federal Register, which was that only for an inmate who is "subject to a

final order of removal under immigration laws ... the Bureau may not apply FSA

time credit toward prerelease custody or early transfer to supervised release." Dkt.

11 at 31.

Respondents also do not dispute that the BOP published that it understood

that it had to follow the wording of the FSA statute, writing: "it is outside the

Bureau's authority to alter exclusions in the First Step Act ... the statutory

exclusions may only be amended by U.S. Congress." *Id.*

The statutory language is clear. Only inmates with a "final order of removal"

are to be excluded from receiving ETCs. Defying the statute, the BOP excludes all

those immigration detainers from receiving the benefit of ETCs, including

Hussain.

11

Recently, two cases have been decided that the BOP cannot exclude inmates with any detainer from the benefits of ETCs. They are *Dylan Jones v. Warden Engleman* (No. 2:22-cv-05292, 2022 (C.D. Cal., Oct. 7, 2022)), Dkt. 24, and *Moody v. Gubiotti* (No. 21-12004, 2022 (D.N.J. Oct 3, 2022)).

Respondents do not challenge that, in using a blanket policy to exclude all those with immigration detainers including Hussain (and not to exclude only those with "final order(s) of removal," as the FSA states) from applying their ETCs towards early transfer to supervised release, the BOP clearly and unambiguously deviates from the legislative text of the FSA.

Meanwhile, the BOP has confirmed in another recent proceeding that it has decided to "undertake a nationwide review of the provisions of its Program Statement on FSA time credits that treated detainers as a basis for disallowing the application of credits to an inmate's sentence." *See generally* Objections to Report and Recommendations, *Sierra v. Jacquez et al.,* No. 22-cv-01509 (W.D. Wash. Jan. 11, 2023) ("*Sierra*"), Dkt. 10 at 5. While it does, the BOP is granting individual waivers to prisoners who seek to have FSA time credits applied to their sentences. Indeed, courts have concluded that foreign-national inmates who are not subject to final orders of removal must be given the credits they have earned, and, in Mr. Sierra's case, must now be released. *Sierra*, Dkt. 17 at 2.

The substantial question of law is whether the BOP has the authority to

deviate from the legislative text of the CARES Act and the First Step Act, thus

discriminating against Hussain.

III.  OTHER FACTORS FOR THIS COURT TO CONSIDER

A.    RESPONDENTS' POLICIES USED TO DENY HOME
      CONFINEMENT UNDER THE CARES ACT ARE AN ABUSE OF
      STATUTORY AUTHORITIES

Respondents describe three policies applied by the BOP to deny Hussain

home confinement. Respondents do not, however, point to where these policies are

included in the CARES Act and the Attorney General's April 3, 2020

memorandum. In enacting these policies, Respondents have deviated from

Congress's intent and the plain text of the CARES Act, and as a result, their

actions are discriminatory and an abuse of their statutory authorities.

i)    Use of the immigration detainer to deny home confinement is a
      discriminatory policy.

Respondents confirm that the BOP's decision to deny Hussain home

confinement was based on his immigration detainer, which is solely issued on the

basis of national origin. Respondents argue that this is not a discriminatory policy

because "Bureau policies are not differentiating aliens versus non-aliens but rather

those who have an immigration detainer and those who do not." (*see* Dkt. 25 at

16).

13

In using the "detainer class" argument, Respondents ignore the actual discriminatory issue. The use of the immigration detainer, which provides no information to the BOP apart from confirming that the inmate is a foreign citizen, to deny home confinement, is a discriminatory policy and such a policy fails the Equal Protection rights of the detainee that are enshrined in the Constitution. Citizenship should be irrelevant to an inmate's treatment. Here Respondents deflect from the core issue of discrimination against Hussain in their use of the detainer class argument.

ii) Respondents' "fear of flight" argument, based on zero evidence, is an abuse of statutory authorities.

Respondents confirm that, after an "individualized" (Dkt. 25 at 6) and "comprehensive" (*id.* at 16) review of Hussain's situation, Hussain is regarded as subject to "fear of flight," thereby justifying their denial of home confinement. This "individualized" argument is contradicted by Respondents' statement that *all* inmates with detainers are regarded as being subject to risk of flight: "rationally related to the legitimate Bureau interest of preventing flight of inmates with detainers." *See id.* Respondents confirm there was no individual or comprehensive review of Hussain's circumstances, because they automatically apply a "risk of flight" to *all* inmates with detainers.

In contrast, in his opening brief, at Docket 11, Hussain provided detailed information from his sentencing, his pre-sentencing report, and the fact that

14

Hussain spent thirty (30) months on bail pending sentencing and pending appeal, wearing an ankle monitor, to demonstrate that he was (and is) neither a danger to the public nor a flight risk. Respondents do not show how the BOP undertook the stated "individualized" and "comprehensive" review of Hussain's situation in the light of the detailed information provided in the petition to arrive at their conclusion that Hussain would be subject to "risk of flight." Respondents merely make the assertion that the BOP undertook this review, unsupported by any evidence other than the undisputed fact that Hussain was (and is) a non-citizen.

Respondents ignore their own published rules, which require the BOP to "carefully review" (Dkt. 11, Ex. 1-1 at 23) the "demonstrated behaviors" (*id.* at 21) based on "the inmate's current offense, sentence, criminal history or institutional behavior that requires additional security measures to be employed to ensure the safety and protection of the public" (*id.* at 21–22). Respondents also ignore the clear directive from the Department of Homeland Security ("DHS"), on the immigration detainer itself, to not use the existence of the detainer for any decision-making purposes (*id.* at 26). The existence of the immigration detainer, therefore, provides no basis for Respondents to assert, argue or conclude that Hussain is at "fear of flight."

By ignoring the detailed evidence, by not providing any alternative evidence, and by ignoring its own rules and the DHS directive, Respondents

15

demonstrate the exact opposite to what they assert, namely that they have abused their statutory authorities in applying their "fear of flight" factor to Hussain.

iii)    The policy requiring 50% of time spent in prison before being considered for home confinement is arbitrary and unevenly applied and is, therefore, irrelevant to the issues raised in this appeal.

For much of its responsive brief, Respondents focus on the 50% rule, which they assert requires inmates to have spent at least 50% of their sentence in prison before being considered eligible for home confinement (*see* Dkt. 25 at 14). As noted in Part II above, this rule is an impermissible deviation from the legislative text. It contradicts the Attorney General's directive that "all at-risk inmates" be considered eligible for home confinement, with the only exclusion being for public safety reasons. The application of this 50% rule is, therefore, an abuse of Respondents' statutory authorities.

Respondents question "Hussain's unsubstantiated claim in his brief that other inmates (who did not have ICE detainers) were released to home confinement despite not serving more than 50% of their time ...." Hussain identifies Mr. Paul Manafort, who was released after serving 2 years of his 7-year sentence, "to serve the rest of his sentence in home confinement due to concerns

about the coronavirus"[1] as a person who served 27% of his sentence before his release to home confinement.

In any event, Respondents concede that the BOP may have released inmates with less than 50% time served for "attenuating circumstance[s]" such as "for health or less violent offenses" (*see* Dkt. 25 at 14). Respondents cannot argue that Hussain, who is medically vulnerable and at minimum risk of recidivism and violence, must strictly abide by the 50% time served policy while Respondents allow other similarly situated inmates to be released, having served less than 50% of their sentence. Hussain also notes for the Court that, as of the date of filing this reply, Hussain has served more than 50% of his sentence to his projected release date.

Respondents ignore a precedential case instructing the BOP to include non-citizens for eligibility to home confinement. Under *Wilson et al. v. Williams et al.* No. 4:20-cv-00794-JG (N. Ohio), as referenced in Hussain's District Court filing, Dkt. 8, included herein as Ex. 3, in the context of home confinement under the CARES Act and the Attorney General's memorandum, the District Court ordered the BOP to "eliminate all requirements that the inmate has served some part of his

---

[1] *See, e.g.*, The Social Magazine, Paul Manafort released from prison due to virus concerns (May 13, 2020), available at https://thesocialmagazine.com/politics/paul-manafort-released-prison-due-virus-concerns.

sentence to be eligible for home confinement" and to "eliminate the requirement
that the inmate be a U.S. citizen."

Respondents had been put on notice by the district court to include non-
citizens in deciding home confinement eligibility, yet their non-compliant policy
continues.

Respondents claim, in their opposition brief, that this "50% rule" is based on
"guidance" from the Attorney General. But that isn't true: the Attorney General
issued no such guidance. For support, Respondents cite to *Collins*, a case that they
suggest supports their position. But that also isn't true: in *Collins*, the Third Circuit
noted that the so-called "50% rule" is a BOP policy, not something directed by the
Attorney General. *See, e.g.*, *Collins v. Canaan*, No. 21-2878, 2022 WL 2752536 at
\*2 (3d Cir. July 14, 2022) (describing the "50% thresholds" as referring "to BOP
memoranda addressing home confinement"). In fact, as this Court noted in *Collins*,
what the Attorney General required is that BOP conduct a more holistic review of
"the totality of the circumstances for each individual inmate...." *Id.*

For the reasons stated, the application of the 50% policy is arbitrary and
irrelevant to Respondents' home-confinement argument.

B.    RESPONDENTS INCORRECTLY DISMISS THE SERIOUSNESS
      OF COVID-19 AT FCI ALLENWOOD LOW

Respondents incorrectly—and with no sensitivity for the suffering Hussain
and others have endured and continue to endure—dismiss the impact of COVID-19

18

at Hussain's prison, asserting blithely that "Hussain's numbers are not correct" and arguing that "FCC Allenwood *currently* has no inmates infected with COVID-19." *See* Dkt. 25 at 4.

Respondents are wrong. The 114 COVID-19 cases out of 116 inmates occurred at Hussain's housing unit, called Gregg A unit, at Allenwood Low in December 2020. These numbers are discussed in *United States v. Mieses*, No. 17 CR 251 (PGG), 2021 WL 124420, at *4 (SDNY, Jan. 13, 2021) ("noting that the number of confirmed cases at FCI Allenwood Low grew from 5 to 136 in just 3 weeks").

It is notable that, although Respondents presumably have access to accurate COVID-19 numbers—including the number of active cases in Hussain's housing unit as of in December 2020—they do not offer them in opposition. The Court is respectfully asked to take note of this selective disclosure and disregard the unverified assertion.

Respondents also completely ignore the evidence of the number of historic COVID-19 cases publicly reported at Allenwood Low and the numbers Hussain disclosed in his Motion to Expedite at the District Court, at Dkt. 11 (filed 11/16/21), at Ex. 2. This data, as Hussain referenced in his Motion to Expedite, was generated from the same website that Respondents reference, and is summarized as follows:

19

i.      50 new COVID-19 cases had been diagnosed in the past several
        weeks;

ii.     several inmates had been hospitalized and one inmate had died; and

iii.    the total number of inmates who had tested positive at that time (in
        November 2021) was 309 out of 878.

Despite Respondents' claims, as of December 4, 2022, there were 21 live

COVID-19 cases at Allenwood. As referenced in Hussain's motion to extend the

filing date of this reply (at Dkt. 27), these cases are almost all at Hussain's housing

unit, Gregg unit.

With hundreds of positive cases reported and one death, Respondents

inappropriately and incorrectly dismiss the seriousness of COVID-19 at Allenwood

Low. The published data shows otherwise.

C.      RESPONDENTS INCORRECTLY STATE THAT HUSSAIN
        RECEIVED TIME CREDIT FOR FSA EDUCATION CLASSES

Respondents incorrectly state that Hussain was credited for the FSA classes

in his Pattern Risk Assessment schedule, at Dkt. 25 at 4-5: "Hussain also claims to

have taken First Step Classes, but he received no credit from the classes because of

his national origin, as he is not a citizen of the United States. Hussain, however,

cited his Male Pattern Risk Assessment, and the BOP credited for his education."

This is Respondents' only comment on Hussain's FSA Earned Time Credit

claim, leaving unchallenged the law and evidence presented in the petition.

20

Respondents are also wrong. The Pattern Risk Assessment is used to record recidivism risk, not to record FSA education class credits. Hussain has not, and continues not to, receive benefit from FSA education classes.

Respondents' assertion that the BOP "credited Hussain for his education" is factually incorrect. The BOP did not and has not given Hussain any time credit for the education classes he has completed. To the extent that Respondents make this point their sole argument as to FSA Earned Time Credits (*i.e.*, that Hussain has received credit), since is it is completely incorrect, this Court is respectfully requested to adjudicate in favor of Hussain's FSA claim.

## IV.    THE DISTRICT COURT ERRED IN SUMMARILY DISMISSING HUSSAIN'S PETITION UNDER RULE 4 STANDARDS

The issue raised at Docket 11 at 8, is "whether the District Court erred in summarily dismissing Hussain's petition for writ of habeas corpus that met Rule 4 standards and Third Circuit and Supreme Court precedent."

Respondents make various arguments for the District Court in summarily dismissing Hussain's petition without seeking to expand the record. Hussain replies as follows:

*First*, Respondents argue that the Court does "not have jurisdiction to review the decision to deny requests for home confinement under the CARES Act" (*see* Dkt. 25 at 11) because, under 18 U.S.C.S. 3621(b), the "designation of a place of imprisonment under this subsection is not reviewable by any court."

21

This argument fails because, as explained at Parts II(B)(1) and II(B)(2) above, their policy deviates from the plain text of the statute and Congress's intent thus discriminating against Hussain, and discrimination, abuse of discretion and Constitutional rights violation falls under the court's jurisdiction. *See Vasquez v. Strada*, 684 F.3d 431, 434 (3d Cir. 2012) (citing *Barden v. Keohane*, 921 F.2d 476, 478 (3d Cir. 1991)); *see also Rodriguez v. Copenhaver*, 823 F.3d 1238, 1242 (9th Cir. 2016) ("Although a district court has no jurisdiction over discretionary designation decisions, it does have jurisdiction to decide whether the [BOP] acted contrary to established federal law, violated the Constitution, or exceeded its statutory authority.").

*Second*, Respondents argue that summary dismissal applies where it "plainly appear[ed] … that the petitioner is not entitled to relief in the district court" (at Dkt. 25 at 10).

Courts cannot summarily dismiss a *pro se* petition that meets the rules in not being "frivolous." *Pro se* petitions are held to a less stringent standard for summary dismissal with courts often according *pro se* petitioners extra leeway when adjudicating the sufficiency of their factual pleadings. Hussain's petition cleared these hurdles—and his petition should not have been dismissed without first requiring the Respondents to respond. *See* Dkt. 11 at 14, 16.

22

In fact, district courts are duty bound to seek answers to a petitioner's factual claims from the respondents to develop the record before arbitrating, *see id.* at 17. And, if a district court issues an order to dismiss without first waiting for a response, it is required to assume the facts in the allegations are true, *id.*

*Third*, Respondents argue that Hussain did not meet their strict 50% policy for time spent in prison before being considered eligible for home confinement, so the Court could summarily dismiss the petition. Hussain's argument is that Respondents' policy of 50% of the sentence required to be served before home confinement deviates from the plain text of the CARES Act and the Attorney General's April 3, 2020 memorandum as authorized by the CARES Act. As explained at Part III(A)(iii), Respondents offer no rationale for their policy, they do not apply the policy uniformly, and they ignore precedent case; as a result, the policy is irrelevant to Respondents' home confinement argument.

## V.   RESPONDENTS' RESPONSE DEMONSTRATES THAT ADMINISTRATIVE REMEDIES WOULD HAVE BEEN FUTILE

The issue raised, at Dkt. 11 at 9, is "whether the District Court erred in requiring Petitioner–Appellant to exhaust the administrative process prior to seeking judicial review."

Respondents explain their case for the administrative process as follows: "Hussain ignored the dictates of exhaustion, which would have allowed the Bureau to have created a factual record using its skills and expertise; analyze the relief

Hussain requests; and ultimately deny Hussain's request by showing it properly exercised its discretion in denying Hussain his request for home confinement." *See* Dkt. 25 at 21.

But courts have discretion to waive the exhaustion requirement when administrative remedies are inadequate or exhaustion would be futile. Respondents base their denial of home confinement on two facts—that Hussain "had served less than 50% of his term of sentence" and that he "had an ICE detainer." *Id.* at 5. Those facts are not challenged. Hussain has an immigration detainer and he had not spent 50% of his sentence in prison when he filed his petition. However, when the parties' positions are clear—and, as in this case, the BOP has already predetermined its decision—then exhaustion is futile and unnecessary, as Hussain explained in his opening brief: "Nothing more is required since any further attempts to exhaust administrative remedies will be met with the exact same results." *Id.* at 12.

The core issue in this case is that Constitutional rights violation and the administrative procedure is inadequate to deal with this issue as Hussain stated "exhaustion may be excused when '[i]t would be futile, if the actions of the agency clearly and unambiguously violate statutory or constitutional rights, or if the administrative procedure is clearly shown to be inadequate to prevent irreparable injury." Dkt. 11 at 33 (citing *Lyons v. Marshalls*, 840 F.2d 202, 205 (3d Cir.

24

1988)). Since Respondents deny that any Constitutional rights violation and irreparable injury has occurred, exhaustion would clearly be futile.

Further, Respondents' stated argument that "a prisoner need not exhaust if he only challenges statutory construction," (at Dkt. 25 at 21), applies against them because here Hussain challenges the statutory construction of both the CARES Act and the First Step Act, where Respondents' policies of using the immigration detainer to exclude Hussain from both home confinement and Earned Time Credits deviate from the plain text of the statutes.

Hussain recognizes that, in many cases, administrative remedies are important and should not lightly be discarded; certainly, he has not sought to deliberately bypass the administrative scheme. The record shows that Hussain was twice rejected for home confinement by the Warden of Allenwood—who ignored the issue of the FSA ETCs—and subsequently by the BOP Regional and Central offices. Under these circumstances, Hussain respectfully asks this Court to waive the typical exhaustion requirements, especially given that Hussain has separately exhausted those remedies—a process that ultimately confirmed that BOP's position was exactly as predicted.

VI.    CONCLUSION

The question with this appeal is not solely whether Hussain is entitled to the CARES Act relief and the FSA Time Credits. The true question of law presented in

25

this appeal is whether a Government agency, such as the BOP, has the authority to deviate from the plain, simple and unambiguous text of those Statutes (CARES Act and FSA) implicated in this appeal. Stated another way, the question of law presented here is whether a Government agency, such as the BOP, has the authority to devise policies which expand beyond the scope intended by Congress and, in so doing, intentionally or inadvertently discriminate against Hussain and other similarly situated non-citizens.

Respondents argue that they do not discriminate because not all non-citizens are issued an ICE immigration detainer. That is sometimes true, just as it is possible that a U.S. citizen might be issued an immigration detainer until he can prove his U.S. citizenship. But, when the process is completed, the *only* inmates or prisoners who are issued immigration detainers are non-citizens, which means that the policies enacted by the BOP deprive a class of inmates or prisoners the right to relief based solely on their national origin. That is discriminatory. It also plainly deviates from Congress's intent: when Congress enacted these Statutes, it didn't intend to create classes of inmates or prisoners; it intended for all inmates or prisoners to be assessed individually and benefit from the Statute.

Hence, the question for this Court is whether Congress intended to create classes of inmates or prisoners who benefit from the Statutes (CARES Act and FSA) implicated here and those prisoners or inmates who do not benefit from the

26

Statutes because of their nationality, the sole reason for the issuance of an immigration detainer. Hussain asserts that Congress never intended to create classes of inmates or prisoners nor did Congress intend to deprive certain inmates (created by BOP policy as a class) relief from the Statutes, except those with a final order of deportation who are on the verge of leaving the country, in the case of the FSA.

Where a Government agency, such as the BOP, has acted beyond its authorized scope and District Court fails to ascertain and rectify such conduct, this Court has the supervisory authority to rectify such conduct which inflicts discriminatory harm on Hussain and others.

## VII. RELIEF REQUESTED

As the Fourth Circuit Court of Appeals recently wrote: "What gives people confidence in our justice system is not that we merely get things right, … it is that we live in a system that upholds the rule of law even when it is inconvenient to do so." Hussain respectfully asks this Court to uphold the rule of law.

For the foregoing reasons, Hussain respectfully requests that this Court determine the substantive issues which violate his civil and constitutional rights, discrimination based on his national origin, abuse of discretion, and others as presented in his petition, his appeal and this reply.

Hussain requests that this Court reverse the dismissal order of the District

Court and remand the case back to the District Court with instructions to grant

relief not inconsistent with this Court's ruling.

Respectfully submitted,

Dated: January 17, 2023          */s/ Sushovan Hussain*

Sushovan Hussain
FCI Allenwood Low
P.O. Box 1000
White Deer, PA  17887-1000

*Pro se* Petitioner–Appellant

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of

Appellate Procedure ("Rule") 32(a)(7)(B) because it contains 4,980 words,

excluding the parts of the brief exempted by Rule 32(f).

Dated: January 17, 2023          */s/ Sushovan Hussain*
                                 SUSHOVAN HUSSAIN, pro se
                                 Reg. No. 24067-111

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is the Appellant–Petitioner, is a

person of such age and discretion as to be competent to serve papers, and that, on

January 17, 2023, he caused to be served a copy of the appended

## REPLY BRIEF FOR APPELLANT/PETITIONER

by having a true and correct copy placed in a sealed envelope addressed as shown

below. I am readily familiar with the practice of delivery by FedEx Corporation.

According to that practice, items are retrieved daily by a FedEx Corporation

employee for overnight delivery.

> GERARD M. KARAM
> United States Attorney
>
> MICHAEL J. BUTLER
> Assistant United States Attorney
> Attorney I.D. No. PA 81799
> United States Attorney's Office
> Middle District of Pennsylvania
> 228 Walnut Street, Suite 220
> Harrisburg, Pennsylvania 17108

Dated: January 17, 2023              */s/ Sushovan Hussain*
                                      Pro Se Appellant / Petitioner



**Office of the Attorney General**
**Washington, D. C. 20530**

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:      THE ATTORNEY GENERAL *[signature]*

SUBJECT:   Increasing Use of Home Confinement at Institutions Most Affected by
           COVID-19

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

## I.   IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS

Case: 22-1604   Document: 31   Page: 32   Date Filed: 01/19/2023

Memorandum from the Attorney General                                          Page 2
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.    PROTECTING THE PUBLIC

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public. That means we cannot simply release prison populations en masse onto the streets. Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic. Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates. It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal. It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease. This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.

x                                        UNITED STATES DISTRICT COURT
                                    FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

===============================

SUSHOVAN HUSSAIN,

        Petitioner,

-vs-                            Civil Action No. 3:21-cv-01635-MEM-DB

RACHEL THOMPSON, et al.,

        Respondents

===============================

---

### MOTION TO EXPEDITE
### AND MEMORANDUM IN SUPPORT

---

Petitioner Sushovan Hussain ("Hussain") respectfully submits this motion to expedite adjudication of his petitions for Writ of Habeas Corpus (the "Petition) and for Temporary Restraining Order ("TRO Petition"), highlighting the recent surge of COVID-19 at Allenwood Low ("Allenwood"). Petitioner brings to the Court's attention that in one of the housing units at Allenwood, Petitioner estimates that approximately 50 new cases of COVID-19 have been diagnosed in the past several weeks. Petitioner understands that several of the infected inmates have been hospitalized and that one inmate has died. As the date of this motion, the number of "confirmed active cases" of COVID-19 reported at Allenwood is 25 and the total number of inmates who have tested positive is 309 out of 878. See https://www.bop.gov/coronavirus.

This surge in COVID-19 infections is not surprising coming just a few weeks after Allenwood was placed on "Level 3 - Intense Modifications", being the highest level tier for COVID-modified operations. The reason for the move to this highest tier was the significant increase in community transmission rates. See Warden Thompson memorandum to inmates August 30, 2021 and https://www.bop.gov/coronavirus/covid19_modified_operations_guide_jsp.

Petitioner posits that this demonstrates Allenwood is "experienc[ing] significant levels of infection", a factor highlighted in Attorney general Barr's April 3, 2020 memorandum as a criterion for "using home confinement, where appropriate, to move vulnerable prisoners out of these institutions". Petitioner highlights that the once-in-a-lifetime pandemic continues to expose him to the risks of illness and death while in prison. See April 2020 declarations of Drs. Goldenson and Novisky at 4:20-cv-00794-JG (Exhibit 1). "This is highly infectious and only the great influenza of 1918...is thought to have higher infectivity", see Goldenson Decl.; "prisons, by their very nature are high risk sites for the spread of infectious disease", see Novisky decl. Inside prisons it is not possible to follow medically-indicated social distancing and hygiene practices putting inmates and staff at extreme risk of infection, illness and death. See Goldenson Decl. (social distancing is effectively impossible).

Petitioner also highlights the September 2021 CDC Report (see TRO Petition Exhibit 1) that "incarcerated populations have experienced disproportionately higher rates of COVID-19 related illness and death". The CDC reported that though "the attack rate was higher among unvaccinated versus fully vaccinated persons...in this outbreak, attack rates were also higher in persons who were vaccinated >4 months before the outbreak compared with persons vaccinated more recently". Petitioner was vaccinated more than six months ago. As an asthma sufferer he is at a significantly greater risk of adverse health consequences in the event he is infected with the COVID-19 virus even though he is vaccinated.

The CARES Act and Attorney General Barr's memo directed the BOP to review "all at-risk inmates" with medical vulnerabilities, as promulgated by the CDC, for home confinement. Petitioner suffers from chronic asthma one of the medical

vulnerabilities listed by the CDC. Petitioner is 57 years old. The CDC has shown that the older people are the higher their risk of severe illness from COVID-19.

Given the seriousness and urgency of the situation, Petitioner respectfully asks the court, pursuant to its inherent power to manage its case schedule, to issue forthwith the relief requested in the Petition, and a writ of habeas corpus or, in the alternative, any other relief which the Court may deem just, appropriate and proper including the granting of temporary restraining order, preliminary injunction and permanent injunction.

Dated: November 1, 2021
    White Deer, pa. 17887-1000

Respectfully submitted

/s/ Sushovan Hussain
SUSHOVAN HUSSAIN
LSCI ALLENWOOD
P.O. Box 1000
White Deer, Pa. 17887-1000

Petitioner Pro Se



INMATE NAME/NUMBER : SUSHOVAN HUSSAIN, 24064-111
FEDERAL CORRECTIONAL COMPLEX-ALLENWOOD LOW
P.O. BOX 1000
WHITE DEER, PA 17887

LEGAL
MAIL

RECEIVED
SCRANTON
NOV 1 6 2021
PER
DEPUTY CLERK

HON. MALACHY E. MANION
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
WILLIAM J. NEALON FEDERAL BLDG & US COURTHOUSE
235 NORTH WASHINGTON AVENUE
P.O. BOX 1148
SCRANTON, PA 18501

7000 0600 0023 2001 6085

U.S. POSTAGE PAID
$0.00

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**FILED
SCRANTON**

OCT 1 8 2021

Per_____
DEPUTY CLERK

```
============================
SUSHOVAN HUSSAIN,

        Petitioner,

-vs-                                    Civil Action No. 3:21-cv-01635-MEM-DB

RACHEL THOMPSON ET. AL.,

        Respondents,

============================
```

---

DECLARATION OF PETITIONER SUSHOVAN HUSSAIN
IN SUPPORT OF HIS HABEAS CORPUS PETITION PURSUANT TO
28 UNITED STATES CODE SECTION 2241 (28 U.S.C.S. 2241)

---

SUSHOVAN HUSSAIN, hereby declares under penalty of perjury pursuant to 28 U.S.C.S. 1746:

1.    I, Sushovan Hussain ("Hussain") am a Pro Se Petitioner, as such I am familiar with the facts of this action

2.    I am currently incarcerated at Federal Correctional Institution Allenwood Low

3.    PURSUANT to all applicable federal rule and law, I make this additional declaration in support of my Habeas Corpus petition (at Doc. No. 1)

4.    In May 2020 the Bureau of Prisons ("BOP") was ordered by Court not to exclude foreign inmate prisoners in deciding eligibility for home confinement under the CARES Act and the Attorney General's March 26, 2021 and April 3, 2021 Memoranda. See Wilson, et al. vs. Williams, et al. Case No. 4:20-cv-00794-JG, (at Doc. No. 85, pg. 7) where, in the context of home confinement under the CARES Act and the Attorney General's Memos, the Court ordered Respondents to... "(a) eliminate all requirements that the inmate have served some part of his sentence to be eligible for confinement" and ... "(e) eliminate the requirement that the inmate be a U.S. citizen".

5.    Courts have concluded that defendants with ICE detainers are not categorically ineligible for COVID-related sentence reduction programs: "... under normal BOP guidelines, defendants with ICE detainers are ineligible for sentence reduction programs. However, ... new Department of Justice directives instruct the BOP to consider 'all at-risk inmates, not only those who were previously eligible for transfer' into home confinement." United States v. Al-Jumail, 459 F. Supp. 3d 857, 866 (E.D. Mich. 2020) (citing 04-03-2020 Directive to BOP, at 2)).

6.    Respondents have been put on clear notice to include non-U.S. citizens in deciding eligibility for home confinement yet they continue to violate the Constitution rights of non-U.S. citizen inmate Hussain and abuse their statutory authorities, thus significantly prejudicing Hussain.

As ordered by the Court in Wilson, et al. vs. Williams, et al., this Court should direct the BOP to consider Hussain eligible, under the April 3, 2020 Attorney General's memo, for transfer to home confinement, and direct the BOP to report back to this Court why the BOP could deem Hussain ineligible. Should the BOP state the ICE Immigration Detainer as a factor for Hussain's ineligibility then this Court should concur with Hussain's argument of discrimination because the ICE Immigration Detainer is issued solely on the basis of Hussain's national origin.

For all the foregoing including the arguments cited above and in the Petition for writ of habeas corpus (at Doc. No. 1), this Court should grant Hussain's request(s) in its entirety.

Dated: October 10, 2021
        White Deer, Pa. 17887-1000

Respectfully submitted _Sushovan Hussain_

/s/ Sushovan Hussain
SUSHOVAN HUSSAIN
Pro Se Petitioner



CERTIFIED MAIL

7000 0600 0023 2001 4173

INMATE NUMBER/NAME: SUSHOVAN HUSSAIN 24667-111
FEDERAL CORRECTIONAL COMPLEX: ALLENWOOD LOW
P.O. BOX 1000
WHITE DEER, PA 17887

RECEIVED
SCRANTON
OCT 18 2021
PER _____
DEPUTY CLERK

LEGAL MAIL

HON. MALACHY E. MANNION
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
WILLIAM J. NEALON FEDERAL BLDG. & US COURTHOUSE
235 NORTH WASHINGTON AVENUE
P.O. BOX 1148
SCRANTON PA. 18501-1148






# FedEx ®

ORIGIN ID:IPTA    (415) 391-5400
SUSHOVAN HUSSAIN
ALLENWOOD LSCI
P.O. BOX 1000

WHITE DEER, PA 17887
UNITED STATES US

SHIP DATE: 17JAN23
ACTWGT: 0.50 LB
CAD: 104386600/INET4580

BILL SENDER

TO **PATRICIA DODSZUWEIT - CLERK**
**U.S. COURT OF APPEALS - THIRD CIR.**
**21400 UNITED STATES COURTHOUSE**
**601 MARKET STREET**
**PHILADELPHIA PA 19106**
(415) 676-2221    REF: HUSSAIN
INV:
PO:    DEPT:



**FedEx**
Express

E

**WED - 18 JAN 4:30P**
**STANDARD OVERNIGHT**

TRK#
0201    **7710 5232 5446**

**19106**
PA-US   **PHL**

# EE REDA

